[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13694
Non-Argument Calendar
_____

D.C. Docket No. 1:13-cv-00083-JRH-BKE


TERRY ALAN BELLEW,

Plaintiff-Appellant,

versus

ACTING COMMISSIONER OF SOCIAL SECURITY,
SOCIAL SECURITY ADMINISTRATION,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(May 6, 2015)

Before TJOFLAT, WILSON and JILL PRYOR, Circuit Judges.

PER CURIAM:

Terry Alan Bellew appeals *pro se* from the district court's order affirming the Administrative Law Judge's ("ALJ") denial of his application for supplemental security income ("SSI") benefits under 42 U.S.C. § 1383(c)(3). On appeal, Mr. Bellew argues the ALJ erred in determining that (1) his seizure disorder failed to meet or equal the criteria of Listings of Impairment ("Listings") 11.02 and 11.03 and (2) his mental disorders failed to meet or equal one of the listed impairments under Listing 12.00. He further argues that the ALJ erred in determining that his subjective complaints regarding his residual functional capacity ("RFC") were not fully credible. Next, Mr. Bellew challenges the ALJ's finding that he could perform jobs that existed in significant numbers in the national economy, arguing that he could not perform any type of work given the behavior he exhibited during his seizures and the danger he presented to others when having a seizure. Finally, Mr. Bellew contends that the ALJ violated a duty to develop the record with Mr. Bellew's 2008-2009 medical records from the Georgia Department of Corrections ("DOC") and with videos showing his behavior during a seizure.

In a Social Security appeal, we must determine whether the ALJ's decision is supported by substantial evidence and based upon proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Substantial evidence is "more than a scintilla and is such relevant evidence as a reasonable person would accept as sufficient to support a conclusion." *Id.* (internal

2

quotation marks omitted).  We may not "decide the facts anew, reweigh the evidence, or substitute our own judgment for that of the [ALJ]."  *Id.* (internal quotation marks omitted).  Even if the evidence preponderates against the ALJ's factual findings, we must affirm if the decision reached is supported by substantial evidence.  *Moore v. Barnhart*, 405 F.3d 1208, 1213 (11th Cir. 2005) (per curiam).

## I.

To determine whether a Social Security claimant is disabled, the ALJ must complete a five-step sequential evaluation process.  *Winschel*, 631 F.3d at 1178; *see also* 20 C.F.R. § 416.1520(a).  The first three steps ask whether the claimant (i) currently is engaged in substantial gainful activity and (ii) has a severe impairment or combination of impairments (iii) that meets or equals the severity of the specified impairments in the Listings.  *Winschel*, 631 F.3d at 1178.  The fourth step asks whether, based on the RFC assessment, the claimant can perform any of his past relevant work.  *Id.*  The final step asks whether there are significant numbers of jobs in the national economy that the claimant can perform given his RFC, age, education, and work experience.  *Id.*

The claimant has the burden of proving that his impairment meets or equals a listed impairment.  *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991).  To meet the requirements of a Listing, the claimant must have a diagnosis included in the Listing and must provide medical reports documenting that the condition meets

the Listing's specific criteria and duration requirement. *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002) (per curiam). An impairment – no matter how severe – that meets only some of the Listing requirements does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). The ALJ's finding as to whether a claimant does or does not meet a listed impairment need not be explicit and may be implied from the record. *Hutchison v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986) (holding that the ALJ implicitly found that the claimant did not meet a Listing because it was clear from the record that the ALJ had considered the relevant law and evidence). Furthermore, although the ALJ must consider the Listings in making her disability determination, she is not required to recite mechanically the evidence leading to her ultimate determination. *Id.*

Listings 11.02 and 11.03 contain the criteria for disability based on epilepsy. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 11.02-11.03. Under either Listing, the degree of impairment is determined by considering the type, frequency, and duration of the claimant's seizures, and both Listings require at least one detailed description of a typical seizure. *Id.* § 11.00(A). The criteria under either Listing may only be applied if the claimant's impairment persists "despite the fact that the individual is following prescribed antiepileptic treatment." *Id.* "Determination of blood levels of . . . antiepileptic drugs may serve to indicate whether the prescribed medication is being taken." *Id.*

4

Listing 11.02, which contains the criteria for convulsive epilepsy, requires documentation with a "detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month, in spite of at least 3 months of prescribed treatment." *Id.* § 11.02.  Additionally, the claimant must demonstrate the existence of daytime episodes, during which he experiences loss of consciousness and convulsive seizures, or nocturnal episodes "manifesting residuals which interfere significantly with activity during the day." *Id.* § 11.02(A)-(B).  Listing 11.03, which addresses non-convulsive epilepsy, requires detailed documentation of seizures that occur more frequently than once a week, in spite of at least three months of prescribed treatment. *Id.* § 11.03.  The claimant must also show "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." *Id.*

A claimant's refusal to follow prescribed medical treatment without a good reason will preclude a finding of disability.  20 C.F.R. § 416.930(b).  However, "poverty excuses noncompliance," such that noncompliance does not prevent a claimant from receiving benefits where the noncompliance is a result of the claimant's inability to afford treatment. *Dawkins v. Bowen*, 848 F.2d 1211, 1212-14 (11th Cir. 1988) (reversing and remanding ALJ's denial of benefits where ALJ relied "primarily if not exclusively" on evidence concerning the claimant's

5

noncompliance with prescribed treatment, without regard to the claimant's ability to afford the treatment).  Accordingly, "when an ALJ relies on noncompliance as the sole ground for the denial of disability benefits, and the record contains evidence showing that the claimant is financially unable to comply with prescribed treatment, the ALJ is required to determine whether the claimant was able to afford the prescribed treatment."  *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (per curiam).  Where the ALJ did not rely significantly on the claimant's noncompliance, however, the ALJ's failure to consider evidence regarding the claimant's ability to afford her prescribed treatment does not constitute reversible error.  *Id.*

## II.

### A.

On appeal, Mr. Bellew appears to argue that his seizure disorder met Listing 11.02, as his seizures were convulsive, grand mal seizures.  After stating that his medical condition is on the Listing of Impairments, he notes that he provided statements about the type, frequency, duration, and sequelae (conditions resulting from a disease) of his seizures and descriptions of a typical seizure throughout the administrative process.  He also notes that he provided CDs and photos showing him experiencing a seizure.  He states that, during his seizures, he walks around, swings his arms, fights, speaks incoherently, spits, exposes himself, urinates,

masturbates, loses consciousness, stares blankly, and even tries to eat and make sandwiches.  He notes that he cannot drive because of his seizures; that he was diagnosed with epilepsy by Dr. Anthony Murro, who evaluated him in 2010; and that he received SSI benefits for approximately 20 years prior to his incarceration in 2008.  Further, Mr. Bellew argues that he has had epilepsy since 1996; that he has memory loss at certain times and was told by doctors that every time a seizure occurs, it causes further memory loss; and that his seizure medications have never been able to control or stop his seizures.  He argues that, because of his memory loss, he often forgets his medication and that, when he has a seizure, he is unsure whether he took his medication.  He states that he had seizures not only because he missed medications, but also because of his past drug use.  He further notes that he has no income and no available means of obtaining his medication.  He appears to argue that he had justifiable cause for failing to follow his prescribed seizure treatment in that he was unable to afford his medication.  Mr. Bellew notes that he was able to obtain medication from a program called Project Access, but he could not afford the medication.  He also received medication from his mother, who was on the same seizure medications, and during his emergency room visits.  Mr. Bellew reiterates that his seizures were not controlled with medications at all times; he contends this can be seen in his 2004 and 2008-2009 medical records from the DOC.

Regarding the seizure-related Listings, we find no reversible error in the ALJ's determination that Mr. Bellew failed to demonstrate that his seizure activity met or equaled the criteria of Listings 11.02 or 11.03 because no opinion from an acceptable medical source found that Mr. Bellew's impairments were equivalent in severity to the criteria of either listed impairment. As noted above, the claimant has the burden of proving that his impairment meets or equals a listed impairment. *Barron*, 924 F.2d at 229. To meet the requirements of a Listing, a claimant not only must have been diagnosed with a condition included in the Listing, but he must also provide medical reports documenting that the condition meets the Listing's specific criteria and duration requirement. *Wilson*, 284 F.3d at 1224. An impairment cannot meet the Listing criteria based only on a diagnosis. *Carnes v. Sullivan*, 936 F.2d 1216, 1218 (11th Cir. 1991); 20 C.F.R. § 416.925(d). An impairment that meets only some of the Listing requirements does not qualify. *Zebley*, 493 U.S. at 530.

In the light of Mr. Bellew's medical record, substantial evidence supports the ALJ's determination that Mr. Bellew's seizure activity did not meet or equal the severity of Listings 11.02 and 11.03. Mr. Bellew's medical records indicated that his seizures did not occur with the frequency or severity needed to meet the Listings. Contrary to his argument that he met Listing 11.02, there was insufficient documentation in his medical records that he experienced either convulsive

8

seizures in which he lost consciousness or nocturnal episodes, which manifested residual effects that interfered significantly with his daily activity, more frequently than once a month. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02. Rather, Dr. Arthur M. Schiff, who conducted a physical RFC assessment, determined that Mr. Bellew's seizures were not of Listing-level severity, as they consisted of brief staring episodes and déjà vu with no postictal state (the recovery period following a seizure). In addition, Mr. Bellew informed Dr. Murro that his typical seizure activity consisted of blank stares, speaking with inappropriate words, picking movements, confusion, unresponsiveness, a déjà vu sensation, enlarged pupils, and memory loss during the event. While Mr. Bellew experienced seizures more frequently than once a month, as required by the Listing, his seizure activity failed to meet all of the Listing's requirements.

With regard to Listing 11.03, similarly there was no detailed documentation in Mr. Bellew's medical records of nonconvulsive seizures occurring more frequently than once a week, in which he experienced transient postictal manifestations of unconventional behavior or significant interference with activity during the day. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03. As noted above, Dr. Schiff determined that Mr. Bellew experienced only brief staring episodes and déjà vu and no postictal state. In addition, evidence contained in Mr. Bellew's emergency-department records indicated that he returned to normal relatively

9

quickly following a seizure.  For example, on one occasion in which he was taken to the emergency department following a seizure, he was back to normal upon arriving at the hospital, and his examination findings did not show any lasting effects from the seizure.  Likewise, on another occasion, treating physicians observed that following a seizure Mr. Bellew was in no acute distress, was alert and oriented, and had no neurological deficits upon examination.  And, notably, his treatment records did not contain the required detailed description of a typical seizure.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00(A).  While Mr. Bellew's mother testified at the ALJ hearing about his typical seizures, he was required to provide medical reports documenting that the conditions of his impairment met the Listings' specific criteria.  *See Wilson*, 284 F.3d at 1224.

Additionally, Mr. Bellew's medical records reflected that he had not taken his seizure medication prior to the seizures for which he was treated, indicating that he was noncompliant with his prescribed antiepileptic treatment consistently for three months as required by both Listings.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 11.00(A), 11.02, 11.03.  On numerous occasions, testing revealed that Mr. Bellew's Dilantin levels were subtherapeutic, and he admitted that he had missed doses of his Dilantin medication.  Mr. Bellew contends, however, that because he was unable to afford his medication, his noncompliance was excused.  *See Dawkins*, 848 F.2d at 1213.  The ALJ made no finding concerning Mr.

Bellew's compliance with his seizure medication and indeed did not mention compliance or lack thereof in the decision.  Thus, although both parties argue at length about Mr. Bellew's noncompliance with his medications, because the ALJ did not rely on Mr. Bellew's noncompliance, the ALJ's failure to consider evidence regarding Mr. Bellew's ability to pay for his medications does not constitute error.  *See Ellison*, 355 F.3d at 1275.  We therefore conclude that substantial evidence supported the ALJ's conclusion that Mr. Bellew's seizure activity did not meet or equal the criteria of Listing 11.02 or 11.03.

B.

Section 12.00 contains the Listings for mental disorders, which are arranged in nine diagnostic categories: "[o]rganic mental disorders (12.02); schizophrenic, paranoid and other psychotic disorders (12.03); affective disorders (12.04); intellectual disability (12.05); anxiety-related disorders (12.06); somatoform disorders (12.07); personality disorders (12.08); substance addiction disorders (12.09); and autistic disorder and other pervasive developmental disorders (12.10)."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).

With the exception of Listings 12.05 and 12.09, all of the section 12.00 Listings consist of (i) a statement describing the disorders addressed by the Listing; (ii) paragraph A criteria, which are a set of necessary medical findings; and (iii) paragraph B criteria, which list impairment-related functional limitations that

11

are incompatible with the claimant's ability to do any gainful activity.  *Id.*
§§ 12.00(A), 12.02, 12.03, 12.04, 12.06, 12.07, 12.08.  Listings 12.02, 12.03,
12.04, and 12.06 also include additional functional criteria, known as paragraph C
criteria.  *Id.* §§ 12.00(A), 12.02, 12.03, 12.04, 12.06.  A claimant can meet one of
these Listings only if "the diagnostic description in the introductory paragraph and
the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed
impairment are satisfied."  *Id.* § 12.00(A).

The paragraph B criteria require a claimant to have at least two of the
following: marked restrictions in activities of daily living; marked difficulties in
maintaining social functioning; marked difficulties in maintaining concentration,
persistence, or pace; or repeated episodes of decompensation, each of extended
duration.  *Id.* §§ 12.02(B), 12.03(B), 12.04(B), 12.06(B), 12.07(B), 12.08(B).
"Marked" means "more than moderate but less than extreme;" marked restriction
occurs when the degree of limitation seriously interferes with a claimant's ability
to function "independently, appropriately, effectively, and on a sustained basis."
*Id.* § 12.00(C); *see* 20 C.F.R. § 416.920a(c)(4) (describing a five-point scale used
to rate the degree of limitation: none, mild, moderate, marked, and extreme).
"Episodes of decompensation" are "exacerbations or temporary increases in
symptoms or signs accompanied by a loss of adaptive functioning, as manifested
by difficulties in performing activities of daily living, maintaining social

relationships, or maintaining concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4). To meet the criterion of "repeated" episodes of "extended duration," a claimant must have three episodes within one year, or an average of once every four months, each lasting for at least two weeks. *Id.*

As regards paragraph C criteria, 12.02(C), 12.03(C), and 12.04(C) require a medically documented history of the alleged mental disorder "of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," as well as one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process resulting in "such marginal adjustment" that it is predicted that "even a minimal increase in mental demands or change in the environment" would cause decompensation; or (3) a current history of at least one year's "inability to function outside a highly supportive living arrangement," with an indication that this arrangement needs to continue. *Id.* §§ 12.02(C), 12.03(C), 12.04(C). Listing 12.06(C) requires that the claimant's impairment results in a complete inability to function outside the area of her home. *Id.* § 12.06(C). Listings 12.07 and 12.08 do not contain a paragraph C. *See id.* §§ 12.07, 12.08.

13

Listing 12.05, which concerns intellectual disability, contains an introductory paragraph with the diagnostic description for intellectual disability, followed by four additional sets of criteria (paragraphs A through D). 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(A), 12.05. For an impairment to meet Listing 12.05, it must satisfy both the diagnostic description in the introductory paragraph and any one of the four sets of criteria. *Id.* § 12.00(A). The introductory paragraph defines intellectual disability as: (i) significantly subaverage general intellectual functioning (ii) with deficits in adaptive behavior (iii) that manifested before age 22. *Id.* § 12.05; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). A valid IQ score of 60 to 70 creates a rebuttable presumption that a claimant manifested deficits in adaptive functioning before age 22 under this paragraph. *Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001).

Finally, Listing 12.09, which pertains to substance addiction disorders, is structured as a reference listing and only serves to indicate which of the other listed impairments "must be used to evaluate the behavioral or physical changes resulting from regular use of addictive substances." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(A), 12.09.

We turn now to the question of whether Mr. Bellew met his burden of proving that his mental impairments met or equaled the criteria of any listed impairment under section 12.00. Mr. Bellew contends that he has all of the

14

following mental disorders: "(12.02); schizophrenic, paranoid and other psychotic disorders (12.03); affective disorders (12.04); intellectual disability (12.05); anxiety-related disorders (12.07); personality disorders. (12.09) Substance Addiction (In Past Years)." Appellant Br. at 6. He argues that he has anger management problems, moods of impending doom, depression, and anxiety, and that he exhibits self-pity, repeats things over and over, and is not a "people person." *Id.* He also asserts that he does not: get along with family members or strangers, follow orders or advice well, and maintain concentration or persistence for long periods of time. He argues that he cannot do everything for himself, that he has never handled his own finances, and that, although admittedly he did crosswords, watched television, and helped his father around the house, he had seizures while doing all of these things. Mr. Bellew further contends that mental evaluations concerning these issues were documented to the Commissioner in his medical records from "Serenity Mental health" at Georgia State Regional Hospital of Admissions, American Works Mental Health Center, "Doctor Daniels," Dr. John C. Whitley, III, and clinic evaluations.

After determining that Mr. Bellew was not engaged in substantial gainful activity, the ALJ concluded that Mr. Bellew had the following severe impairments: personality disorder, not otherwise specified; antisocial traits; rule out mood disorder due to a general medical condition; seizure activity; and anxiety disorder,

15

not otherwise specified.  The ALJ then considered these impairments under the criteria of Listings 12.04 and 12.06, "as well as other relevant listings," and determined that Mr. Bellew's impairments did not meet or equal a listed impairment.  As shown below, this determination was supported by substantial evidence in the record.

Mr. Bellew has not met his burden of proving that he satisfied the requirements of Listings 12.02, 12.03, 12.04, 12.06, 12.07, and 12.08.  First, his mental conditions did not meet the criteria of paragraph B.  Although Mr. Bellew had the burden of providing medical reports showing that his conditions met the specific criteria of the Listings, he provided no medical evidence showing that he had marked limitations in activities of daily living, maintaining social functioning, or maintaining concentration, persistence, or pace.  *See Wilson*, 284 F.3d at 1224 (requiring the claimant to provide medical reports); 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02(B), 12.03(B), 12.04(B), 12.06(B), 12.07(B), 12.08(B).

Regarding activities of daily living, during Dr. Whitley's evaluation of Mr. Bellew in February 2010, Mr. Bellew informed Dr. Whitley that:  he was able to bathe, dress, and cook for himself; he shopped independently; he helped his father make small repairs around the house; and he was able to wash dishes and make his bed.  Mr. Bellew also informed Dr. Whitley that he was capable of performing additional household chores.  Additionally, Mr. Bellew reported in his October

16

2010 function report that he was able to dress, bathe, groom, and feed himself.  He reported in a disability report that same month, however, that his mental condition limited his ability to take care of his personal needs and that, occasionally, he did not want to bathe, shower, brush his teeth, or eat a meal.  Nonetheless, both Dr. Celine Payne-Gair and Dr. Joseph Garmon, who both performed a mental RFC assessment on Mr. Bellew, determined that he was only mildly restricted in his activities of daily living.  Substantial evidence thus supports the ALJ's decision that, at best, Mr. Bellew had moderate restrictions in activities of daily living, as opposed to marked limitations.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(1); 20 C.F.R. § 416.920a(c)(4).

As regards social functioning, Mr. Bellew informed Dr. Whitley that he maintained a relationship with his two brothers and was close to his daughter.  Mr. Bellew also reported that he talked on the phone "a great deal" and that he spent time with others walking, going to meetings at the shelter where he stayed, and attending church.  But, he also indicated in his October 2010 function report that he had problems getting along with others and that he was antisocial.  Following his evaluation, Dr. Whitley noted that Mr. Bellew had difficulty with interpersonal relations and determined that Mr. Bellew's ability to interact with coworkers and supervisors might be mildly impacted by his reported history of anger and mild anxiety.  Similarly, Dr. Payne-Gair and Dr. Garmon determined that Mr. Bellew

17

had mild difficulties in maintaining social functioning.  Substantial evidence thus supports the ALJ's decision that, at best, Bellew had moderate, not marked, difficulties in maintaining social functioning.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2); 20 C.F.R. § 416.920a(c)(4).

As for maintaining concentration, persistence, and pace, Mr. Bellew informed Dr. Whitley that he was able to follow directions, watch television, complete crossword puzzles, and manage his own finances.  Dr. Whitley determined that Mr. Bellew was able to understand and follow instructions and that his ability to sustain effort and focus on pace for timely completion of tasks was only mildly impacted by his impairments.  In his October 2010 function report, Mr. Bellew indicated that he was able to pay bills, count change, handle a savings account, and use a checkbook or money order.  Dr. Payne-Gair determined that Mr. Bellew had only mild difficulties in concentration, persistence, or pace.  However, Dr. Garmon, determined that Mr. Bellew had moderate difficulties in maintaining concentration, persistence, or pace.  He found that Mr. Bellew was moderately limited in his ability to understand, remember, and carry out detailed instructions.  Dr. Garmon also determined, though, that Mr. Bellew was able to concentrate and persist for simple tasks, make simple work-related decisions, and adjust to slow-paced and infrequent changes.  Thus, because there was no evidence of any medical provider determining that Mr. Bellew had marked limitations in

maintaining concentration, persistence, or pace, substantial evidence supported the ALJ's decision that, at best, he had moderate limitations in this area. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3); 20 C.F.R. § 416.920a(c)(4).

Moreover, even if the ALJ erred in determining the extent of Mr. Bellew's limitations in one of the aforementioned areas, any error was harmless because Mr. Bellew had to meet two of the four criteria in paragraph B, and substantial evidence supports the ALJ's finding that Mr. Bellew did not suffer from repeated episodes of decompensation. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02(B), 12.03(B), 12.04(B), 12.06(B), 12.07(B), 12.08(B). Mr. Bellew does not argue that he experienced any episodes of decompensation that were of extended duration, as defined in the regulations, nor was there evidence of such episodes in the record. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4). In fact, upon her review of Mr. Bellew's medical records, Dr. Payne-Gair found no evidence of episodes of decompensation. Because he failed to meet the paragraph B criteria, Mr. Bellew could not meet or equal Listings 12.07 or 12.08. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(A), 12.07, 12.08. Thus, he could meet or equal Listings 12.02, 12.03, 12.04, and 12.06 only if he satisfied the paragraph C criteria. *See id.* at § 12.00(A).

Substantial evidence supported the ALJ's conclusion that Mr. Bellew failed to satisfy the paragraph C criteria, and, thus, he did not meet or medically equal

Listings 12.02, 12.03, 12.04, and 12.06.  The ALJ did not discuss the threshold inquiry into whether Mr. Bellew presented an adequate medical history of the alleged mental disorder of the requisite severity, but, even assuming that Mr. Bellew satisfied this requirement, for Listings 12.02, 12.03, and 12.04 he still needed to show: (1) repeated episodes of decompensation of extended duration, (2) a residual disease process resulting in "such marginal adjustment" that it is predicted that "even a minimal increase in mental demands or change in the environment" would cause decompensation, or (3) a current history of at least one years' "inability to function outside a highly supportive living arrangement," and an indication that this arrangement needs to continue.  *See id.* §§ 12.02(C), 12.03(C), 12.04(C).

First, as noted above, no medical evidence supported that Mr. Bellew had experienced repeated episodes of decompensation, no less of extended duration. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4).  Second, the medical opinions and evidence that Mr. Bellew had only mild or moderate limitations in activities of daily living, social functioning, and maintaining concentration, persistence, or pace were sufficient to support the ALJ's conclusion that the evidence did not demonstrate that "even a minimal increase in mental demands or a change in the environment" would predictably cause Mr. Bellew to decompensate.  Finally, the record indicates that Mr. Bellew was not completely

20

unable to function outside of a highly supportive living arrangement, considering that he was able to care for his own personal needs and adequately participated in activities of daily living.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4).  The record also indicates that he was not completely unable to function outside the area of his home, as required for Listing 12.06, because he reported that he walked outside frequently, shopped independently, and attended church.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(C).  Notably, Dr. Payne-Gair also found no evidence of any paragraph C criteria.  Because he also failed to meet paragraph C criteria, Mr. Bellew could not meet or equal Listings 12.02, 12.03, 12.04, or 12.06.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).

Finally, Mr. Bellew also failed to meet his burden of proving that he satisfied the requirements of Listing 12.05.  Dr. Whitley's testing revealed that Mr. Bellew had a verbal IQ score of 68, but Mr. Bellew offered no other medical evidence that satisfies Listing 12.05.  There was no evidence of his intellectual or adaptive functioning before age 22 in the record, and Dr. Whitley's testing revealed a full scale IQ score of 74 in the borderline range, as opposed to the required significantly subaverage general intellectual functioning.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05; *Crayton*, 120 F.3d at 1219.  Because Mr. Bellew failed to provide evidence satisfying the diagnostic description in the introductory paragraph of Listing 12.05, he cannot meet the threshold requirement for a finding

21

of disability under that Listing. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A). And, he meets no other listed impairments, he cannot meet Listing 12.09, as that Listing is a reference listing indicating which of the other listed impairments must be used to evaluate the behavioral or physical changes resulting from regular use of addictive substances. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00(A), 12.09.

Accordingly, the ALJ's conclusion at step three of the sequential analysis is supported by substantial evidence.

## IV.

At step four of the sequential analysis, the ALJ must determine a claimant's RFC and whether, in the light of his RFC, a claimant can perform his past relevant work or, if not, can make an adjustment to other work, in the light of his RFC, age, education, and work experience. *Winschel*, 631 F.3d at 1178; 20 C.F.R. § 416.920(a)(4). A claimant's RFC is an assessment, based upon all relevant evidence, of the claimant's ability to work despite his impairments. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); 20 C.F.R. § 416.945(a)(1). The ALJ considers all of the evidence in the record in determining the claimant's RFC. *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004).

To show a disability based on testimony of pain or other subjective symptoms,

the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms].

*Wilson*, 284 F.3d at 1225.  Under Social Security regulations, the ALJ follows a two-step analysis in considering a claimant's complaints: first, the ALJ decides whether there is an underlying medically determinable impairment that could reasonably be expected to cause the claimant's pain or other symptoms, and second, once a claimant has established an impairment that could reasonably produce his symptoms, the ALJ evaluates the intensity and persistence of the symptoms and their effect on the claimant's functioning.  20 C.F.R. §§ 416.929(a), (c)(1).

In weighing the evidence, credibility determinations "are the province of the ALJ."  *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) (per curiam).  However, if the ALJ discredits the claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so," and the failure to do so "requires, as a matter of law, that the testimony be accepted as true."  *Wilson*, 284 F.3d at 1225.  When evaluating a claimant's subjective symptoms, the ALJ must consider such things as: (1) the claimant's daily activities, (2) the nature and intensity of pain and other symptoms, (3) precipitating and aggravating factors, (4)

effects of medications, and (5) treatment or measures taken by the claimant for relief of symptoms.  *See* 20 C.F.R. § 404.1529(c)(3).

Mr. Bellew argues that the ALJ's determination that his subjective complaints were not fully credible was improperly conclusory.  He asserts that the fact that he engaged in a reasonable range of daily living activities did not negate the credibility of his subjective complaints.  He further contends that the ALJ mischaracterized his testimony and the statements of his relatives regarding his ability to engage in functional activities.  He contends that the ALJ's credibility assessment was not supported by substantial evidence, given that it failed to specify how his daily schedule rendered the symptoms he alleged not credible.  And, he argues that any inconsistencies in his testimony regarding the onset of his seizures were due to his impaired memory as a result of his seizures.

The ALJ found that Mr. Bellew had the RFC to perform a full range of work at all exertional levels and a limited, but satisfactory, ability to understand, remember, and carry out detailed instructions; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. The ALJ also determined that Mr. Bellew could no more than occasionally climb; was precluded from climbing ladders, ropes, or scaffolds; and should avoid all exposure to hazards, such as machinery and heights.  After finding that Mr. Bellew's medically determinable impairments could reasonably be expected to

24

cause his alleged symptoms, the ALJ made a clearly articulated finding that the statements of Mr. Bellew and his relatives were not fully credible, specifically, that their allegations concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment.

Furthermore, contrary to Mr. Bellew's argument on appeal that the ALJ's determination was improperly conclusory, throughout his decision the ALJ explicitly articulated the reasons for discrediting the subjective testimony of Mr. Bellew and his relatives.  The ALJ discussed several inconsistencies between their subjective testimony, on the one hand, and the medical evidence and Mr. Bellew's previous statements regarding the severity of his limitations, on the other.  The ALJ noted that Mr. Bellew had given varying accounts regarding the onset of his seizures, including that he had suffered seizures since birth, had been diagnosed with epilepsy at age 18, and had started experiencing seizures only after sustaining a head injury in 2004.  Although Mr. Bellew asserts that any inconsistencies in his testimony regarding the onset of his seizures were due to his impaired memory as a result of the seizures, the ALJ did not base his credibility determination on this inconsistency alone.  The ALJ also discussed additional discrepancies between Mr. Bellew's alleged limitations and his prior statements concerning his daily activities, including, in part, whether he was limited in his ability: (1)  to walk and

talk, when he also asserted that he walked outside all the time and had informed Dr. Whitley that he talked on the phone "a great deal"; (2)  to remember and concentrate, when he had informed Dr. Whitley that he watched television and did crossword puzzles all the time; and (3)  to follow instructions, when he had told Dr. Whitley that he could follow instructions.  While Mr. Bellew contends the fact that he engaged in a "reasonable range of daily living activities" did not negate the credibility of his subjective testimony, the ALJ was entitled to consider his daily activities when evaluating his subjective symptoms.  *See* 20 C.F.R. § 404.1529(c)(3).

Additionally, the ALJ found that the medical opinions of the physicians who had evaluated Mr. Bellew did not corroborate all of his allegations regarding the severity of his limitations.  Dr. Schiff determined that Mr. Bellew had no exertional, postural, manipulative, visual, communicative, or environmental limitations, other than a need to avoid all hazards, such as machinery and heights. Dr. Stanley opined that Mr. Bellew had no exertional, manipulative, or visual limitations, but, due to his seizures, he could never climb ladders, ropes, and scaffolds; could only occasionally climb ramps and stairs; and needed to avoid all exposure to hazards, such as machinery and heights.  Thus, the ALJ included a number of Mr. Bellew's alleged limitations in his RFC assessment, including his limited abilities to climb and to understand, remember, and carry out detailed

26

instructions, and his need to avoid exposure to hazards, all of which were supported by objective medical evidence in the record.

Furthermore, Mr. Bellew did not report to his medical providers that he experienced seizures of the severity that he and his mother asserted. For example, when he saw Dr. Murro at an epilepsy clinic, Mr. Bellew described his typical seizure activity as consisting of blank stares, speaking with inappropriate words, picking movements, confusion, unresponsiveness, a déjà vu sensation, enlarged pupils, and memory loss during the event. His medical records did not contain any references to spitting, urinating, masturbating, or attempting to make a sandwich during a seizure, as he and his mother contended at the hearing before the ALJ and he has reiterated on appeal.

We conclude that substantial evidence supported the ALJ's finding that Mr. Mr. Bellew's subjective testimony regarding the intensity, persistence, and limiting effects of his symptoms was not credible to the extent that it was inconsistent with the ALJ's RFC assessment. As the ALJ found, Mr. Bellew's testimony also was inconsistent with his prior statements and was uncorroborated by the medical evidence of record.

## V.

At step five of the sequential evaluation process, the Social Security Commissioner must establish that, given the claimant's RFC, age, education, and

work experience, significant numbers of jobs exist in the national economy that the claimant can perform. *Winschel*, 631 F.3d at 1178, 1180. An ALJ may make this determination either by applying the Medical Vocational Guidelines or by obtaining the testimony of a vocational expert ("VE"). *Id.* at 1180. "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Id.* (internal quotation marks omitted). However, an ALJ is not required to include findings resulting from a hypothetical question that the ALJ properly rejected as unsupported. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004) (per curiam).

The claimant bears the burden of proving that he is disabled and, thus, is responsible for producing evidence to support his claim. *Ellison*, 355 F.3d at 1276. Nonetheless, the Commissioner has a limited burden at step five to show the existence of a significant number of jobs that the claimant can perform. 20 C.F.R. § 416.920(a)(4)(v).

On appeal, Mr. Bellew argues that he could not perform any type of work given the behavior he exhibited during his seizures, specifically, the danger he presented to others when having a seizure. He argues that the Commissioner, the VE, and the ALJ should have considered the length of years he had been experiencing seizures, his actions during his seizures and his lack of control over

28

those actions, and the extraordinary strength he developed during his seizures.

He contends that a doctor stated on a "letter of disability" that he should not

perform activities that would put himself or others at a risk of injury as a result of

his seizures.[1]  In addition, Mr. Bellew argues that the ALJ erred by failing to

consider the response to the second hypothetical posed to the VE, in which the VE

testified that someone who experienced at unpredictable intervals seizures lasting

15 minutes at a time, three times per week could not perform any work in the

national economy.  Mr. Bellew asserts that the ALJ erred in determining that this

second hypothetical was unsupported by evidence of record, as he presented to the

ALJ CD videos of his behavior during seizures.

    Substantial evidence supported the ALJ's determination that, considering

Mr. Bellew's age, education, work experience, and his RFC, there existed a

significant number of jobs in the national economy that he could perform, given

that the ALJ properly relied on the testimony of the VE and on the medical

opinions of record in making this determination.  *See Winschel*, 631 F.3d at 1180.

The ALJ properly obtained the testimony of a VE and asked the VE to consider

two hypothetical individuals.  In the first hypothetical, the VE was asked to

consider an individual with Mr. Bellew's RFC and testified that such an individual,

---

[1]     Mr. Bellew also argues that insufficient weight was given to his treating physician's opinion and medical records; however, we need not consider this argument because it was not presented to the ALJ and was raised for the first on appeal.  *See Kelley v. Apfel*, 185 F.3d 1211, 1215 (11th Cir. 1999) (per curiam).

29

who also had Mr. Bellew's age, education, and prior relevant work experience, could perform several jobs in the national economy, namely hand packer, hand laundry, dining room attendant, garment folder, and plastic assembler.  In the second hypothetical, the VE was asked to consider an individual who, in addition to the limitations described in Mr. Bellew's RFC, experienced seizures three times per week during the workday, at unpredictable intervals, lasting roughly 15 minutes at a time, during which he was unable to focus and was off task.  The VE testified that such an individual could not perform any work in the national economy.

The first hypothetical question, which mirrored the ALJ's RFC finding, properly included all of Mr. Bellew's limitations that were supported by substantial evidence in the record.  *See Crawford*, 363 F.3d at 1161.  This hypothetical included the findings of Dr. Schiff, who determined that Mr. Bellew had no exertional limitations, other than a need to avoid all hazards, such as machinery and heights, and Dr. Stanley, who determined that Mr. Bellew had no exertional limitations but could never climb ladders, ropes, and scaffolds; could only occasionally climb ramps and stairs; and needed to avoid all exposure to hazards. It also included nonexertional-limitation findings of Dr. Garmon, who concluded that Mr. Bellew was moderately limited in his ability to understand, remember, and carry out detailed instructions; to respond appropriately to changes in the work

30

setting; and to set realistic goals or make plans independently of others.  Thus, the limitations used to determine whether Mr. Bellew could perform jobs that existed in the national economy were supported by the medical opinions of record.

Further, contrary to Mr. Bellew's argument on appeal, the ALJ did not err by failing to consider the VE's response to the second hypothetical, as the additional limitations included in the second hypothetical were not supported by the evidence of record.  *See Crawford*, 363 F.3d at 1161.  As described above, substantial evidence supported the ALJ's finding that Mr. Bellew's assertions regarding the frequency and severity of his seizures were not credible.   The ALJ properly relied on the VE's testimony, and the ALJ's finding at step five that there is work Mr. Bellew can perform in the national economy is supported by substantial evidence.

## VI.

Whether or not a claimant is represented by counsel, the ALJ has a duty to develop a full and fair record.  *Ellison*, 355 F.3d at 1276; *see also* 20 C.F.R. § 416.912(d) (stating that, before the ALJ determines the claimant is not disabled, "[the ALJ] will develop [the claimant's] complete medical history for at least the 12 months preceding the month in which [he] file[s his] application").  "Nevertheless, the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim."  *Ellison*, 355 F.3d at 1276; *see* 20 C.F.R. § 416.912(a) (stating that the claimant

"must furnish medical and other evidence that [the ALJ] can use to reach conclusions about [the claimant's] medical impairment(s)").

In determining whether remand is necessary for development of the record, we consider "whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995) (per curiam) (internal quotation marks omitted).  Accordingly, "there must be a showing of prejudice before we will find that the claimant's right to due process has been violated to such a degree that the case must be remanded to the [ALJ] for further development of the record." *Id.* (internal quotation marks omitted).  Before ordering a remand, we will review the administrative record as a whole to determine if it is inadequate or incomplete or "show[s] the kind of gaps in the evidence necessary to demonstrate prejudice." *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997) (per curiam).

Mr. Bellew argues that the ALJ neglected the duty to develop the factual record by failing to obtain Mr. Bellew's 2008-2009 medical records from the DOC (in order to document the history of his seizure disorder) before concluding that Mr. Bellew had presented no evidence of disability during the relevant time period. Mr. Bellew contends that these records would reflect that he had been taking seizure and anti-psychotic medications while incarcerated and yet continued to have seizures.  He further asserts that he signed a form to retrieve these medical

records when he submitted his SSI application,  but the records were not obtained.

With regard to the videos of his seizures, Mr. Bellew does not argue specifically

that the ALJ erred in not considering them, but he notes in his brief that the videos

constituted evidence of the severity of his seizures.  He also contends that the ALJ

"refused to take them as he said he had no means to view them."  Appellant Br. at

9.

Here, there was sufficient medical evidence in the existing record for the

ALJ to make an informed decision.  *See Graham*, 129 F.3d at 1423.  We agree that

the ALJ neglected his duty to develop the record with Mr. Bellew's 2008-2009

medical records from the DOC, as these records contained his medical history for

the 12 months preceding the filing of his SSI application on January 11, 2010.  *See*

*Ellison*, 355 F.3d at 1276; 20 C.F.R. § 416.912(d).  Nonetheless, this error was

harmless because Mr. Bellew has alleged no facts showing either that there were

gaps in the evidentiary record or that he suffered clear prejudice.  Although Mr.

Bellew contends that these records would document the history of his seizure

disorder and reflect that he had been taking seizure medications while incarcerated

and yet continued to have seizures, the record already contained ample evidence of

the history of his seizure activity.  In addition, Mr. Bellew suggests that these

additional records would show that his seizure disorder was not susceptible to

complete control, even with appropriate medications, which is a threshold

requirement under Listing 11.00. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00(A) (stating that the criteria under Listing 11.02 and 11.03 may only be applied if the claimant's impairment persists "despite the fact that the individual is following prescribed antiepileptic treatment"). But Mr. Bellew's seizure activity still must meet or equal the severity of Listings 11.02 and 11.03, and he has never contended that these additional records would be relevant to the severity of his seizures or that they would provide evidence establishing that his seizure activity meets or equals Listing-level severity. *See Wilson*, 284 F.3d at 1224 (stating that, to meet the requirements of a Listing, a claimant must provide medical reports documenting that his condition meets the Listing's specific criteria and duration requirements); 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 11.02-11.03 (describing the criteria for disability based on seizure activity). Further, to the extent Mr. Bellew seeks to offer this evidence to counter the Commissioner's argument that Mr. Bellew's noncompliance with medication precluded him from meeting the requirements of a Listing, the ALJ did not rely on or even discuss in his decision whether Mr. Bellew was noncompliant. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00(A). Thus, Mr. Bellew cannot show that the ALJ's failure to develop the record with this evidence resulted in unfairness or clear prejudice. *See Brown*, 44 F.3d at 935.

Additionally, contrary to Mr. Bellew's and his mother's assertion that they submitted CDs containing video recordings of Mr. Bellew's seizure activity to the Commissioner, there is no evidence in the record that they submitted any CDs. Because Mr. Bellew is responsible for producing evidence in support of his claim, the burden was on him to submit the CDs to the Commissioner. *See Ellison*, 355 F.3d at 1276; 20 C.F.R. § 416.912(a). In any event, even if the ALJ's failure to request these videos from Mr. Bellew or to watch them at the administrative hearing was error, Mr. Bellew suffered no prejudice. *See Brown*, 44 F.3d at 935. Videos of Mr. Bellew suffering seizures would not have supported the longer term or frequency of seizures that he alleged. The videos, at best, may have been relevant to the severity of his seizures, but the ALJ already had accepted the fact that Mr. Bellew had seizures and that his seizure disorder constituted a severe impairment. Because there was substantial evidence to support the ALJ's decision without this evidence, Mr. Bellew cannot show prejudice.

## VI.

Upon review of the entire record on appeal, and after consideration of the parties' briefs, we affirm.

**AFFIRMED.**